Good morning, Your Honors. My name is Chalmers Johnson, and I represent the plaintiff and appellant in this case, Ms. Martinez-Patterson. First, let me apologize for not having my suit coat with me. This is the first time in 20 years I've left my coat at home on the way to court, so my apologies for being underdressed. Your Honors, we're appealing a grant of summary judgment, and I apologize. I'd like to reserve five minutes for rebuttal. Please watch the clock. I shall. We're appealing a grant of summary judgment on this case. This is a civil rights employment law case, and I've been doing employment law for quite some time, and I'd just like to repeat that when you go up in front of a judge for summary judgment, you've got to have evidence and inference. You've got to have some facts that a juror can see, and then you've got to be able to put those facts together for the court in order to allow the court to draw an inference that a jury might draw, and if you can do that, you survive summary judgment. I believe that you've all read my brief, so I'm really not here to repeat it to you. I've taken some notes on what facts and inferences that I think that the court should have drawn in this case and didn't draw. It may be somewhat repetitive of the brief, so I'd be happy to answer any questions or have you direct me if there's a particular area you'd like me to head in. I'll take that as I go right ahead, Mr. Johnson, and keep talking. Your Honors, I'd like to talk a little bit about the race-sex retaliation portion of it. There are really two parts of this case, I guess three. A claim that Ms. Martinez-Patterson was discriminated against and retaliated against because of her complaints about discrimination to her employer. Then we've got another portion about the Family Medical Leave Act and the Family Leave Act in Washington where she claims that the company interfered with her attempts to take family leave. And finally, a wrongful termination claim really based on the family leave argument because at the time that this happened, the Family Leave Act did not have a private right of action. Now it does, but at that time it didn't, so it's phrased as a wrongful termination in violation of public policy. The race discrimination and retaliation portion of it, I've looked at the timeline on this and I think the timeline and the players really prove the case here as far as where the inference should come from that there really is a claim here. The players that are important that I've kind of boiled it down to are Russo, Rossi, and Hosseini. In civil rights cases, we always try to point out a bad guy because these cases are always about motive. Why did somebody do something? So you need to point to the person who did it and show why they did it. In this case, our bad guy, if you will, is Russo. And I gave you the three names, Russo, Rossi, and Hosseini. Here's how they fit together. Rossi is the highest up manager. Under Rossi is Russo. And then Martinez-Patterson and Mr. Hosseini were both on the same level. Mr. Hosseini was under Ms. Russo, but Ms. Patterson initially was not. So there was an investigation, I guess, of Mr. Hosseini with the EEO, isn't that right? Yes, Your Honor. It was internal. And was done. And the EEO consultant said that your client hadn't articulated any specific discriminatory remarks or actions. And so that was the conclusion of her report. That was the conclusion. Is that right? That is correct. She basically said that Ms. Martinez-Patterson felt like she was being discriminated against, but she didn't see any evidence to support that. And that was the outcome. That falls within our argument of direction for this going, where Russo finally causes the termination of Ms. Patterson. I thought there was a reduction in force, right? There wasn't. And, in fact, Russo was also, or her position was eliminated at the same time. Is that right? That's true. And I don't think that that has any impact on the case, whether Russo would have affected Ms. Martinez-Patterson being terminated. Russo and Rossi were both replaced in different positions as well. There was a large change in structure. And that was the vehicle that they used to get rid of Ms. Martinez-Patterson. I think we understand the chronology of what happened. But where in any of that is the evidence that it was for a discriminatory motive rather than for the stated rationale, which I think you agree that the proffered reason on its face was a legitimate non-discriminatory reason. Your claim is just that it's pretextual, right? And where is the evidence that they really had some other reason? So if you follow, that's why I'm pointing at Ms. Russo. If you look at kind of the timeline, in September 2014, Ms. Patterson makes her first complaint to Ms. Rossi, which is a verbal complaint about Mr. Hosseini. Nothing's done. But two weeks later, she makes a written complaint also to Ms. Rossi. And that's when Rossi turns it into the EEO for investigation. On page 8, I included, it was a writing by Ms. Martinez-Patterson. But you can see that AT&T had a policy that required any manager who had a report of discrimination to take it immediately to the EEO office for investigation. So back with Rossi, first time verbal, nothing. Second time written, Rossi follows the policy and takes it over to the EEO. There's an investigation, unsubstantiated, an internal investigation. It's after that investigation that ended in 2014, at the end of 2014, that then Ms. Patterson is moved over to Ms. Russo. And now Ms. Russo becomes her supervisor, the supervisor over the person she's been complaining about, Mr. Hosseini. But she wasn't let go until December of 2016, right? Correct, Your Honor. So, I mean, there's a long gap there. That hurts, doesn't it, in terms of trying to prove some nexus? Yes, sir, and that's why we need to fill it in. And so in July of 2015, that's when Ms. Martinez first goes to Russo about Hosseini and makes a complaint about Hosseini, I think in writing. And at this point, Russo, instead of following AT&T company policy and turning it over for another EEO investigation, goes to Ms. Patterson and tells her that Hosseini has every right to challenge her position and says, in fact, I would act just like him if I was working with you. Are you talking about her arguing about her performance evaluation? This is in July of 2015, when Ms. Patterson went to Ms. Russo complaining again that Mr. Hosseini was mistreating her because she was a woman and because of her ethic background. But he was just on the same level. He wasn't her supervisor. That's correct. She went to her supervisor to complain about it. And that was a year and a half before she was terminated. That's true. And that was July of 2015. The response from Ms. Russo both violated AT&T policies and was certainly aggressive, telling her that she just needed to see it as a positive thing if this guy was being mean to her. It's not an appropriate reaction from a supervisor, both within AT&T's policies, and I would say a jury might find that. In January of 2016, we continue closer and closer to the date. This is where she had the evaluation, and she actually responded on her evaluation in writing. That's on page 8, and made it quite clear that she was making yet another complaint of discrimination. She even quotes the AT&T policies about a manager must take it to the EEO if there is a complaint. This complaint, again, dies with Russo. Russo keeps the complaint, and, of course, Russo has also told Ms. Patterson at this point, if you have a complaint about Hosseini, you have to come to me. Again, violation of AT&T policy. She should be able to go to the EEO office. So you've got Russo moving in to protect Hosseini and to stop Ms. Patterson from making EEO complaints as soon as Rossi put her under Russo. I'm not sure exactly what the, if any, legal relevance there is to this, but what are we to make of the fact that the January 30, 2016 complaint, her stated basis for thinking that she's been the victim of discrimination seems to rely heavily on her own sense of ethnic stereotypes. I mean, she says that she has, quote, you know, good skills with men from Western civilization, but there's just a problem with the Indian worldview. I mean, what's the relevance of that in assessing, you know, the merit of her claim that she's been the victim of discrimination? I don't think that there's any relevance in assessing the merit of her claim, but I do see the irony in someone claiming that they're being discriminated against because of their race, national origin. Talking about discrimination is coming from the fact that these other guys are from this national origin. Certainly she has explained why she feels like she's being discriminated against, and it has to do with ethnicity and treatment between men and women of different ethnicities. I don't know that I could ever prove that case as a race or sex discrimination case, but I'm asserting it as a protected act. And so the question that you've asked is what is the relevance to our review of this case? I think the only relevance is whether she had a good faith belief that there was some discrimination going on. And I feel like the evidence shows that at the very least we've made that hurdle. Whether we could go further with that, we'll never know. And I'm kind of with you, Your Honor, that it puts a little bit of an ironic spin on her complaint. You say we'll – I mean, this is for your retaliation claim, but you're also – I mean, for the discrimination claim, I don't understand the statement, we'll never know whether we could go forward with that. You're asking us to reverse so that you could go forward with that claim too, right? Your Honor, and I'll concede, it's mostly going to be the retaliation claim because of exactly what you've said. They did investigate it. I'm not going to try to blow it out of proportion and say it's more than it is. Ms. Martinez-Patterson explains why she feels like she's being discriminated against, and a lot of her explanation comes from the fact that she feels like the Middle Eastern men don't respect women. Okay, that in and of itself can be considered a discriminatory statement if you want to go there. And so I understand, and I'm not here to argue that one to death. What I do believe is that we've got a very clear protected act, and that's the basis of the retaliation claim. Do you want to reserve more of your – some of your rebuttal time? You're into it. Yes, Your Honor, I would, but in fact, I think I need to keep going to keep continuity of what I'm saying here. Thank you for bringing it up, Your Honor. And just to close this gap, because that's what you were all asking about, January 2016 is when she makes this response to Rousseau. Remember, she's still under Rousseau's thumb, and Rousseau's been the one who's keeping her from going and making internal complaints. Then you have the FMLA issue start. Rousseau does the same thing with the FMLA. She tells her, you can't go straight to the FMLA office. Everything has to come through me. And then she tells her things that aren't true about the FMLA. She doesn't send her to the FMLA office. I see this as a continuing pattern. Was that contrary to AT&T's procedure? I didn't find any procedure that said that you have to go through your supervisor and have your supervisor fill out your FMLA paperwork. And my argument is that if there isn't a policy that says that, Rousseau's making this up. And it is a pattern, and it's the same thing she's doing with the EEO complaints. And so to bring the whole thing together time-wise, it is in August of 2016, August 12th to 22nd, when the formal FMLA requests come in and Ms. Rousseau. When your client asked initially for FMLA leave, she said it was to take care of her brother. And I think the response was that the FMLA was not available for siblings. Had Martinez-Patterson made it clear that she considered her brother a dependent so that she was acting in loco parentis, or was that something she figured out later? Ms. Martinez-Patterson didn't know at the time what in loco parentis was. But did she make it clear that she was taking care of her brother, that he was a dependent on her at the time she first asked for leave? Do we know that? I believe so, Your Honor, but I can't pinpoint the site right now. So I'll say I believe that she did. I think that was clear because that's why she was asking for the time. I just saw that she was requesting for her brother. She was looking forward to, I think, a surgery. And so I feel that that was probably implied in it. But to bring us back to the dates, if you follow it, you have a pattern from Rousseau starting with the EEO, continuing on with the FMLA. Denying the FMLA may very well have been a retaliatory act based on the EEO. She didn't like her making complaints. She was stopping her from making complaints. She stopped her from getting her FMLA. Tell me, the reduction in force evaluations, on which she ended up at the low end of the rung, was that before or after she made her FMLA request? Yes, Your Honor. It's taken me right where I wanted to go. October 4th is when Rousseau was asked to make the evaluation for Rossi. And that evaluation, she made Ms. Martinez-Patterson the lowest person on the rung, guaranteeing that she would be the one taken out if there was a reduction in force. And that was in October 4th. I guess it was October 16th that she completed her leave forms. So that was after that event. Is that right? Right. It was August that she was making her formal request for FMLA, the first time she had withdrawn her request after being told that it didn't cover it. You have a few seconds left. Do you want to save those? I will, Your Honor. Thank you very much for the opportunity. We'll hear from the other side. May it please the Court, my name is Susan Pangborn, representing AT&T Services in this matter. The District Court properly granted AT&T's motion for summary judgment. Put simply, the undisputed material facts simply do not support Ms. Martinez-Patterson's claims. Rather, she relies almost exclusively on speculation, her subjective view of her own performance, and, to Your Honor's point, her own biases against men of Indian national origin. She was let go in a reduction in force that affected numerous other individuals, including, as Mr. Johnson noted, her supervisor and her supervisor's supervisor. The decision of how many individuals would be let go in her group was in fact made above even Mr. Rossi. AT&T presented evidence that those who worked with her and both Mr. Rossi, who Ms. Martinez-Patterson admitted she did not believe was biased against her, and Ms. Rousseau thought that she was strong technically. She had strong technical skills. She was a hard worker. But she was very difficult to work with. We presented evidence, AT&T presented evidence, that both Mr. Rossi, who had been her supervisor for years, even before she moved under Ms. Rousseau, with the other database administrators in her group, as well as other team members, female team members who worked with her. In terms of what she was doing, the individuals worked together as a team, led by two team leads who would ultimately make the call on, this is how we're going to do things, this is how we're going to meet the deadlines. But these are more disputes over was she really discriminated against or not. I think what opposing counsel is saying is the chronology alone raises the inference that her termination was due to discriminatory motives. Why doesn't the chronology raise that inference? Because I believe that the chronology has, in fact, been misstated. First of all, he's pointed to Ms. Rousseau as the wrongdoer. There's really no evidence of bias against Ms. Martinez-Patterson by Ms. Rousseau. The only evidence of bias is that when she complained about how Mr. Hosseini was pushing back against her, Ms. Rousseau said, you need to expect to be challenged. And by the way, if you have issues with people who were then under her, come to me. I mean, if you look at the emails, there's nothing, Ms. Martinez took it as a threat by Ms. Rousseau, but there's nothing threatening about what she said. Ms. Martinez-Patterson came into this with tunnel vision and a bias. So, for example, in the EEO investigation, it was Mr. Hosseini, but she was also complaining about her direct supervisor, Mr. Shaw. And when she went to Mr. Rossi and said, he's sending me demeaning emails, Mr. Rossi said, show me the emails. And they're in the record, and there's nothing demeaning about them. But when pushback came from men of Indian national origin, she saw it as discrimination. And Ms. Rousseau had, in fact, worked with Mr. Hosseini for many years. And so there's no evidence whatsoever that her telling Ms. Martinez-Patterson, hey, you need to expect to be challenged on deadlines, that that's his role, that it was because she was a Hispanic female, and he was of Middle Eastern origin. I mean, as opposed to she had worked with him, she had been on calls with him, she had observed his demeanor. And the two other team members that we submitted testimony from noted that Ms. Martinez-Patterson didn't like to be challenged. She didn't like to provide timelines. She became upset when she was given deadlines. She wanted to do things in her way and in her own time. And unfortunately, in the real world, that doesn't always work. You can't take as much time as you think you need. So opposing counsel suggests that Martinez-Patterson's complaints about Hosseini and her request for FMLA leave are associated temporally with the decision to Ms. Rousseau's decision to give her a bad evaluation, which contributed to her being terminated. And so that the court should have inferred, or a jury could reasonably infer, that there is a causal relationship and that it was in retaliation for protected activities. So a couple of things. First of all, there's no temporal proximity between her complaints of discrimination and the ultimate ranking. Again, this is a reduction in force. So this isn't performance evaluations. We're going to counsel someone out. With regard to the reduction in force, the directors, Mr. Rossi, with some input from Ms. Rousseau, but not just based on Ms. Rousseau's input, because again, Mr. Rossi had worked with Ms. Martinez-Patterson for longer than Ms. Rousseau, ranked the four database administrators. And the company gave significant evidence why she was ranked the lowest. It was consistent with her previous review. It was consistent with her review before then. And in terms of her complaints, if you look at what her complaints were with regard to her reviews back for 2015, Ms. Rousseau, if you read the reviews, gives a lot of praise to Ms. Martinez-Patterson. Again, technically strong, but she notes you need to work on your communications with other team members, that other team members have reported that you push back, you want to do things your own way, et cetera. And in Ms. Martinez-Patterson's mind, that is, it's all Mr. Hosseini. I mean, there's no evidence whatsoever that Mr. Hosseini even went and complained. But she's got that viewpoint of, if you are doubting my communication skills, it's because men of Mideastern national origin don't like women and don't like the culture. Their culture is to put down women. But she had the same issues with other females. She would actually hang up the phone when she was questioned in team meetings. And so when you're ranking people and you're going to have fewer people potentially to do the work, who are you going to keep? I mean, the other individuals who provided testimony noted that they would, in fact, have to go to Mr. Hosseini or the other lead to push her to do the work, to push her to give answers as to how long this is going to take, and that they, in fact, avoided working with her. They felt like they had to walk on eggshells around her, and they preferred to go to other DBAs. So when you're ranking someone and you have four DBAs who are technically strong, who are you going to rank the lowest? You know, it's not going to be the person who's not going to be a team member. I'd also like to address the issues with regard to the FMLA interference. So Ms. Martinez-Patterson first let her supervisor and one of the team leads know in March about her brother having a serious health issue. She came back. She told them how she planned to deal with it, and the response was, that's fine, let us know how we can help. She came back in August and asked about FMLA, and there's no evidence whatsoever that she was discouraged from taking FMLA. When she came to Ms. Rousseau in August, Ms. Rousseau went to Human Resources to ask the question, can she take FMLA for her brother, and Human Resources said no. And Ms. Rousseau's response, again, if you look at the responses that Ms. Martinez-Patterson takes such issue with, Ms. Rousseau's response was very helpful. She indicated that FMLA did not cover siblings, and at that point in time, there was no reason to understand that Ms. Martinez-Patterson thought she would qualify under imperentis loci. She gives Ms. Martinez-Patterson the policy. She directs her to HR, both in terms of an email, this is how you reach them, and in terms of, this is the number, all information that was on AT&T's intranet to begin with, that Ms. Martinez-Patterson could find. She noted she wasn't sure if the company might make an exception under the circumstances. And she also gave Ms. Martinez-Patterson information about other leaves she could take if it didn't qualify for FMLA. And so, again, it's the email she's relying on, and if you read it, you see a supervisor trying to help her. With regard to the timeline, at that point in time, Ms. Martinez-Patterson was seeking information. What would she qualify, what potential things, whatever. She did not request FMLA leave until after the rankings and ratings had already been submitted. And again, Ms. Rousseau turned in the request because it comes from the supervisor, and the information that came back was, this is too soon. She requested leave in December, and Ms. Rousseau provided it in October. So again, it's a misstatement of the timelines. If you really look at the timelines, if you really look at the underlying facts, you see legitimate nondiscriminatory reasons, and you see there's just no evidence other than in her own view that Ms. Martinez-Patterson was discriminated against or retaliated against. Do you have case law that would support your position that her subjective belief is not enough to present an issue to the jury? If she perceives that she's being discriminated against, does that raise a jury question or not? It does not. The case law, and as the district court properly found, and I believe one case would be Steckel, if there's no direct evidence of discrimination, and here there is not, and an employer is able to articulate a legitimate nondiscriminatory, nonretaliatory reason, then the employee must come forward with specific and substantial evidence of pretext. You would never have summary judgment if an employee's own belief that I've been discriminated against was enough. She needs to be able to find facts and present facts that support that, and they simply don't exist here. Thank you. Again, we would just point out that AT&T has fully articulated and supported non-subjective reasons for why she was ranked the lowest. Ms. Martinez-Patterson, her briefs make much of the Whittington email, which Mr. Johnson did not exist, but when you look at the timeline again, this was a reduction in force. The business case that's submitted by HR notes that the individuals are going to be notified on 10-28. The business cases are submitted. Mr. Rossi, who had to do this not just for Ms. Martinez-Patterson's work group, but for all those underneath him, submitted those, and then above him they decide whether it's one, whether it's two, how many positions in each group, if any, are going to be eliminated. Then he received an email, which is in the record, on the 27th saying, you need to notify these individuals. Included in that were Ms. Rousseau and Ms. Martinez-Patterson. The email says, don't tell anyone before the 28th, you must tell them on the 28th. That is the day when he found out that he was part of the surplus, as well as Ms. Rousseau. Of note, Ms. Rousseau and Mr. Rossi were able to find other jobs. As part of the surplus, if you were affected, you could apply for other openings within the company. They did and were selected. Ms. Martinez-Patterson applied for a few openings, but she's admitted that she's not claiming in this litigation that she did not receive them because of any protected characteristic. Again, we would point out that if you look at her complaints, they're based on her own biases. They were taken seriously and they were investigated, but there simply was no substance to them. Thank you. Thank you. We'll give you a minute for rebuttal. Thank you, Your Honor. Very quickly, I'll agree with counsel on two things. One, certainly a plaintiff cannot overcome summary judgment by just saying that they don't believe what the defendant has said. The subjective viewpoint is important to whether or not Ms. Martinez-Patterson had a reasonable belief or good faith belief that she was making a complaint of discrimination. That's where it comes in. I also agree that in order to overcome summary judgment, we can't just say they're wrong, they're lying. In the very beginning when I came up here, I told you we need evidence and inference. Those are the two things that win summary judgment. We need to show you some facts, and I need to pull those facts together in a way from which you could look at it and say a reasonable juror could also come to that inference based on those facts. That's what we've done here, Your Honors. I've presented a timeline that I think is factual. A reasonable juror could find that it points in the direction of a plaintiff's case. I've also provided the email saying that Ms. Patterson was not part of the reduction in force, which I think also points to some real questions that a reasonable juror could resolve in our favor. Your Honors, I'm concluding. If you have any last-minute questions, I'd be happy to answer them otherwise. Thank you very much for your time. I think we have your argument. The case of Maria del Carmen Martinez-Patterson v. AT&T Services is submitted. And the final case is Stephen L. Kaiser and Gloria Young v. Whatcom County and Davis McKeachrin, which is submitted on the briefs. And we are adjourned for this session.
judges: Gilman, IKUTA, MILLER